IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____
                              :
JOHN W. JOHNSTON,             :      HON. JEROME B. SIMANDLE
                              :
            Plaintiff,        :      Civil No. 05-5235 (JBS)
                              :
      v.                      :
                              :          OPINION
CORRECTIONAL MEDICAL SERVICES,:
INC., et al.,                 :
                              :
            Defendant.        :
_____
```

Cara E. Leheny, Esq.
Catherine L. Sakach, Esq.
WOLFBLOCK LLP
1940 Route 70 East
Suite 200
Cherry Hill, NJ 08003
     Counsel for Plaintiff John W. Johnston

Timothy J. Galanaugh, Esq.
MURPHY & O'CONNOR, LLP
Commerce Center
1810 Chapel Avenue West
Suite 130
Cherry Hill, NJ 08002-4607
     Counsel for Defendants Correctional Medical Services, Inc.,
     David Meeker, Lionel Anicette, and Abu Ahsan

**SIMANDLE**, District Judge:

Plaintiff, formerly an inmate at South Woods State Prison

("South Woods"), has brought suit against his South Woods medical

providers alleging that they were deliberately indifferent to his

severe, and rare, congenital disease in violation of the Eighth

Amendment's prohibition of cruel and unusual punishment.[1]

_____

[1] Though Plaintiff also set forth medical malpractice claims
in his complaint, Plaintiff has voluntarily withdrawn those

Defendants Correctional Medical Services, Inc. ("Defendant CMS"), David Meeker, Regional Vice President of CMS ("Defendant Meeker"), Dr. Lionel Anicette, Medical Director of CMS for New Jersey ("Defendant Anicette"), and Dr. Abu Ahsan, Plaintiff's primary doctor ("Defendant Ahsan"), now move for summary judgment on grounds that Plaintiff has submitted no evidence which tends to show deliberate indifference on the part of Defendants [Docket Item 70].[2]  The Court finds, for the reasons set forth below, that summary judgment is appropriate as to Plaintiff's claims against Defendants CMS, Meeker, and Anicette, but the Court will grant only partial summary judgment to Defendant Ahsan, because material facts are in dispute regarding Plaintiff's Eighth Amendment claim for refusal to provide necessary surgeries and pain medication.

I.   **BACKGROUND**

   **A.   Facts**

   Plaintiff suffers from bladder exstrophy, a congenital condition in which the bladder is exposed because of a poorly developed abdominal wall.[3]  (Pl. Ex. A at 33; Ahsan Dep. at 50.)

---

claims.  (Pl. Opp'n at 1.)

   [2] The two other defendants in this matter, Dr. Woodward and Devon Brown, both with the New Jersey Department of Corrections, are not a part of the instant motion and have not sought summary judgment on Plaintiff's Eighth Amendment claim.

   [3] Plaintiff also has Hepatitis C and, at some point in time, had hydronephrosis of the kidneys, which appears to be excess

It is an exceedingly rare disorder, appearing in one in 30,000 people.  (Anicette Dep. at 97.)  As part of his treatment for this condition, Plaintiff uses a reconstructed bladder, made from his intestines, though he retains his original bladder.  (Pl. Dep. at 28-29; Ahsan Dep. at 51-52.)  Plaintiff must drain his Koch pouch himself, by inserting a catheter into an opening in his abdomen, called a "stoma."  (Pl. Dep. at 29; Ahsan Dep. at 40.)  This new bladder is known as a "Koch pouch" and has had required numerous surgical revisions as part of its maintenance.  (Pl. Dep. at 17-19; Ahsan Dep. at 51-52.)  In total, Plaintiff underwent twenty-six surgeries to his abdominal area prior to his incarceration at South Woods.  (Pl. Dep. at 17, 19.)  All of these surgeries, and in fact all of Plaintiff's medical treatment, were performed by Dr. Terry Hensle, at Columbia Presbyterian Medical Center.  (Id. at 17, 27.)

Plaintiff's condition is prone to various complications.  In addition to bladder revisions, Plaintiff is at risk for urinary tract, bladder, and kidney infections.  (Id. at 27-28.)  He is in danger of a urinary obstruction, which if not treated immediately could lead to kidney failure.  (Id. at 55-56.)  Further, the repeated insertion of a catheter causes built up scar tissue, called "stenosis," that must be removed so that Plaintiff can

_____

fluid in the kidneys that leads to constriction of the vessels in the kidneys.  (Pl. Dep. at 32-33.)

continue to catheterize himself.  (Id. at 29-30.)  Plaintiff also has "fistulas," which are tracts that connect cavities in the body, but are not naturally occurring.  (Pl. Dep. at 28; Ahsan Dep. at 118-19.)  Instead, fistulas result, inter alia, from infection, surgical complication, and poor circulation.  (Ahsan Dep. at 119.)  On July 2, 2008, when Plaintiff arrived at South Woods, a fistula had developed from his lower abdomen, near an old incision site, and migrated into his bladder.  (Pl. Ex. 1 at 15.)

Plaintiff received extensive medical treatment, of some form, while held at South Woods, and as evidenced by his voluminous medical records.  Though he began his incarceration in the South Woods general population, on September 29, 2003, his primary care doctor at the time, Dr. Hoey, moved him to the Extended Care Unit ("ECU").[4]  (Pl. Ex. 1 at 133.)  From July 3, 2003, until he was released on July 26, 2006, doctors and nurses at South Woods regularly treated and tested Plaintiff for abdominal problems.  (Pl. Exs. F-I.)  In addition, South Woods staff brought him to various hospitals fifty-eight times over the course of his incarceration.  (Pl. Dep. at 71-72.)  During those visits he had radiology and urology consults, treatment for

---

[4] The ECU functions as a subacute hospital within South Woods, with regular nursing around the clock, and houses inmates who for various reasons need regular medical assistance. (Anicette Dep. at 114-17.)

problems with his catheter, and testing and evaluation of his
abdominal issues, including an endoscopy and a colonoscopy.
(Def. Ex. E.)

Plaintiff does not dispute the facts of this course of care,
but instead argues that it was deliberately inadequate.  For ease
in analysis, the Court will set out the facts as to Defendant
Ahsan, and then turn to Defendants CMS, Meeker, and Anicette.

1. Defendant Ahsan

Sometime in April 2004, Defendant Ahsan became Plaintiff's
primary treating physician.  (Pl. Ex. 1 at 433-45.)  Plaintiff
was Defendant Ahsan's first and only patient with bladder
exstrophy and he learned about the condition from free medical
web sites.  (Ahsan Dep. at 52-54, 56.)  Though he does not know
all the possible complications for Plaintiff's conditions, he's
aware of at least the major risk - obstruction of the urinary
tract which can lead to kidney failure.  (Id. at 55-56.)
Defendant Ahsan concedes that he is not an expert in Plaintiff's
condition and that he does not know the details of Plaintiff's
medical history.  (Id. at 52, 55.)  For this reason, Defendant
Anicette explained that CMS primary care doctors when dealing
with a rare condition like bladder exstrophy, "would be more
reliant on the advice and recommendations coming from []
specialist[s]."  (Anicette Dep. at 113.)

Among Defendant Ahsan's duties was the regulation of

5

Plaintiff's pain medication. (Ahsan Dep. at 156, 161-62.) This was an important part of Defendant Ahsan's job, because, among other things, Plaintiff cannot self-catheterize without sufficient pain management. (Pl. Ex. 1 at 230.) From April 2004 through July 2004, Plaintiff had difficulty with pain. (Id. at 435-591.) From the record it appears that each time Plaintiff complained of pain, medical providers at South Woods gave him medication or increased the dosage of his pain medication, either the same day or within two days.[5] (Id.)

The Oxycontin appears to have effectively managed Plaintiff's pain, because from November 14, 2005 through April 13, 2006, Plaintiff only reported abdominal pain on four occasions. (Pl. Ex. 1 at 1262, 1287; Pl. Ex. 6 at 1116, 1129.)

---

[5] On April 19, 2004, Plaintiff complained of burning pain while urinating, and a nurse maintained his current pain medication, a duragesic patch, but suggested that Plaintiff return the next day for a reevaluation. (Pl. Ex. 1 at 435-36.) The next day, the pain was worse and Defendant Ahsan increased the dosage of the patch. (Id. at 438-39, 443-44.) Then on May 5, 2004, Plaintiff complained of pain and Defendant Ahsan increased the dosage of the patch again. (Id. at 459-60, 464-65.) On June 7, 2004, Plaintiff complained of pain and Defendant Ahsan changed his medication to Oxycontin. (Id. at 501-02.) On June 10, 2004, Defendant Ahsan increased the Oxycontin dosage again in response to Plaintiff's pain. (Id. at 513.) On July 12, 2004, Plaintiff had back and abdominal pain and a nurse gave him Tylenol. (Id. at 556.) On July 26, 2004, Plaintiff told a nurse that his pain medication was not working, but that he could wait until the next day to be seen by a doctor. (Id. at 581.) On July 28, 2004, Defendant Ahsan, after being informed by a nurse that Plaintiff's pain was not adequately controlled by his current medication, increased the Oxycontin dosage. (Id. at 591.)

On April 11, 2006, Defendant Ahsan changed Plaintiff's pain medication from Oxycontin to MS Contin.  (Pl. Ex. 6 at 1245.) From April 18, 2006 through May 24, 2006, Plaintiff made six separate complaints about his abdominal pain and difficulty self-catheterizing, stating that he was in constant pain.  (Id. at 1255-1340.)  It appears that Defendant Ahsan kept Plaintiff on MS Contin until his release in July, 2006.  (Pl. Dep. at 42.)  At the time, Defendant Ahsan determined that Plaintiff's "activities and objective findings d[id] not correlate with his [claims of] severe abdominal pain.  He is apparently eating well with no nau[s]ea/vomiting. [Plaintiff] request[ed] to be on oxycontin, he does not agree to try non-narcotics."  (Pl. Ex. 6 at 1283.)  He based this determination, in part, on his experience with inserting catheters through the stoma of other patients, to reach their urethra.  (Ahsan Dep. at 156.)  According to Defendant Ahsan, those patients do not need narcotic pain medication. (Id.)  He also pointed to Plaintiff's history of addiction.[6]  (Id. at 161.)  Defendant Ahsan did not consult a pain management doctor, nor did he refer Plaintiff to substance abuse treatment. (Id. at 162.)  He simply kept Plaintiff on medication that did not adequately address Plaintiff's severe pain, episodic nausea and vomiting, difficulty handling food, and trouble self-

---

[6] Plaintiff states that he had a problem with heroin use in 1988 or 1989, received treatment, and has not used illegal drugs since.  (Pl. Dep. at 26.)

catheterizing.  (Pl. Ex. 6 at 1255-1340.)

In addition to pain management, Defendant Ahsan was responsible for caring for Plaintiff's bowel obstructions.  (Pl. Ex. 1 at 1230-31.)  Beginning in June, 2005, Plaintiff began to suffer from chronic constipation.  (Id. at 998, 1007.)  By August, 2005, Plaintiff repeatedly complained of painful penile and fistula discharge that smelled like stool, abdominal pain, and bleeding and pus from the Foley catheter.  (Id. at 1053-91).  On September 30, 2005, after a nurse found the distressed Plaintiff sitting on the side of his bunk, bending forward, rocking and holding the frame of his bunk, (id. at 1141-43), a Dr. Pomerantz ordered staff to send Plaintiff to the hospital.  (Id. at 1147-50.)  Doctors in the emergency room treated Plaintiff with intravenous fluids, he was eventually able to move his bowels, and returned to South Woods.  (Id. at 1156-57.)

From October 13, 2005, through October 27, 2005, Plaintiff again repeatedly complained of abdominal pain and constipation, with a nurse noting that he appeared "pale and tired."  (Id. at 1190-21.)  As treatment, the South Woods staff gave Plaintiff laxatives, but no other treatment for a possible bowel obstruction.  (Id. at 1210-21.)  According to Plaintiff's medical records, Defendant Ahsan saw "no obvious clinical evidence of bowel obstruction" as of October 25, 2005.  (Id. at 1214-15.)  On October 27, 2005, Defendant Ahsan reviewed an x-ray which

8

indicated that Plaintiff had a possible bowel obstruction and placed Plaintiff on a liquid diet.[7]  (Id. at 1230-31.)  On November 2, 2005, Defendant Ahsan reviewed what appears to be a new x-ray and determined that Plaintiff should be brought to the hospital because his condition had worsened.  (Id. at 1244.)  A week later, Plaintiff returned to South Woods, "emaciated" and showing "generalized weakness."  (Id. at 1247, 1251.)  Plaintiff continued to report instances of difficulty self-catheterizing, and discharge from his penis and his fistula.  (Pl. Ex. 1 at 1262-96; Pl. Ex. 6 at 1135-1221, 1255-1306.)

Plaintiff points to one more area where Defendant Ahsan allegedly was deliberately indifferent to Plaintiff's severe medical needs - his failure to provide Plaintiff with recommended surgeries.  On September 13, 2004, the Cooper Hospital Urology Clinic saw Plaintiff.  (Pl. Ex. 1 at 654-70.)  Testing revealed that Plaintiff had a right ureteric obstruction and multiple fistula in the urethra and the Cooper Hospital Clinic concluded that an ileoconduit[8] might be called for.  (Id. at 679.)  On October 8, 2004, Defendant Ahsan reviewed the final report from a Dr. Parra, a urologist at Cooper Hospital, and made these notes:

---

[7] Plaintiff states that this x-ray was taken on October 19, 2008, but the Court cannot find evidence of when this x-ray was taken in the records Plaintiff has submitted.

[8] According to Defendant Ahsan, an ileoconduit is a procedure wherein the intestine is diverted to use as a bladder. (Ahsan Dep. at 121.)

> REVIEWED FINAL REPORT FROM DR. PARRA, UROLOGIST,
> COOPER HOSPITAL.  PER HIS OPINION, THE [PLAINTIFF]
> NEEDS TO HAVE HIS [RIGHT] URETERAL OBSTRUCTION AND
> MULTIPLE URETHRAL FISTULAS ASSESSED.  THE ONLY WAY
> TO GET RID OF A FISTULA IS TO PERFORM A CYSTECTOMY[9]
> WHICH IS A BIG OPERATION GIVEN PREVIOUS SURGICAL
> HX.  IT MAY BE NECESSARY TO PERFORM AN ILEOCONDUIT.

(Id. at 694.)  Similarly, in February, 2005, Dr. Farajallah,

another consulting physician, noting Plaintiff's recurrent

bladder and urinary tract infections, concluded that "[s]urgical

intervention is the ultimate solution given [Plaintiff's]

anatomical abnormalities." (Id. at 844-49.)  Dr. Farajallah's

note was forwarded to Defendant Ahsan.  (Id. at 849.)  Defendant

Ahsan did not order a cystectomy, and states that he does not

know why, and there is no record suggesting that Plaintiff

received an ileoconduit.  (Ahsan Dep. at 121.)  Plaintiff's

medical records indicate that he complained of abdominal pain, as

well as fistula infection, until he was released.  (Pl. Ex. 6.)

2.   Defendants CMS, Anicette, and Meeker

Defendant Anicette, as Regional Medical Director for CMS,

first learned of Plaintiff's condition in the summer of 2005,

when a public defender representing Plaintiff approached him.

(Anicette Dep. at 125-27.)  The public defender told him that

Plaintiff was having medical problems at South Woods and, in

particular, was experiencing pain while self-catheterizing.

---

[9] A cystectomy is the removal of the bladder.  (Ahsan Dep. at 120.)

(Id.)  In response to the lawyer's informal request for help,
Defendant Anicette had a short conference with Defendant Ahsan
about Plaintiff and Defendant Ahsan assured him that Defendant
Ahsan was taking proper care of Plaintiff.  (Id. at 126-28.)
Defendant Anicette did not further explore Plaintiff's treatment,
in part because the public defender never filed a formal request
for additional medical care and in part because he wanted to
preserve Defendant Ahsan's autonomy.  (Id. at 131.)

     In that same conference with Defendant Ahsan, Defendant
Anicette learned that Plaintiff wanted to see a particular
urologist, but that Defendant Ahsan had sent Plaintiff to a
urologist at St. Francis.  (Id.)  Some time later Defendant
Anicette heard from the ombudsman regarding Plaintiff's desire to
see a particular urologist, but as he recalled, CMS was waiting
to see whether the St. Francis urologist saw any need to contact
Plaintiff's preferred urologist.  (Id. at 132-33.)  Defendant
Anicette and Defendant Meeker, as Vice President of CMS for the
Region, also discussed Plaintiff's request to see a particular
urologist in New York, who had previously cared for Plaintiff.
(Meeker Dep. at 25.)  Defendant Meeker explained that Plaintiff's
request was ultimately denied because "[t]he care that [could] be
provided to [Plaintiff] that is medically necessary was available
within the established network [CMS has] in New Jersey" and the
cost of transporting Plaintiff out of state would have been

11

burdensome.  (Id. at 26.)

**B.   Procedural History**

Plaintiff filed his complaint in this matter, pro se, on November 2, 2005 [Docket Item 1].  In that complaint, Plaintiff set out both medical malpractice claims and well as a claim under the Eighth Amendment, pursuant to 42 U.S.C. § 1983.[10]  (Compl.) On July 31, 2006, the Magistrate Judge granted Plaintiff's motion for pro bono counsel and Plaintiff has proceeded with legal representation since that date [Docket Item 39].  Discovery has proceeded for over one year and was complete on April 3, 2008 [Docket Item 65].  On July 15, 2008, Defendants CMS, Meeker, Anicette, and Ahsan filed the instant motion for summary judgment [Docket Item 70].  In their motion, Defendants argue that Plaintiff has submitted no evidence from which a fact-finder could conclude that any of the named defendants were deliberately indifferent to Plaintiff's medical needs.

**II.   DISCUSSION**

**A.   Standard of Review**

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

---

[10] Plaintiff has voluntarily withdrawn his medical malpractice claims against Defendants CMS, Meeker, Anicette, and Ahsan, (Pl. Opp'n at 1), and so the Court will grant summary judgment to Defendants on those claims.

12

law." Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Liberty Lobby</u>, 477 U.S. at 250; <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable inferences from the evidence, "the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered." <u>United States v. Premises Known as 717 South Woodward Street, Allentown, Pa.</u>, 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e)) (citations omitted).  As the Supreme Court has explained,

> Rule 56(c) mandates the entry of summary judgment, after
> adequate time for discovery and upon motion, against a

> party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotations and citations omitted).

### B.    Eighth Amendment

"The Eighth Amendment to the United States Constitution prohibits any punishment which violates civilized standards and concepts of humanity and decency." Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992), superseded on other grounds by 42 U.S.C. § 1997e(a).  A prisoner does not lose this protection despite a prison sentence, for "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993).  Those Eighth Amendment protections are implicated when the government fails in its obligation to provide medical care to inmates, whose incarceration prevents them from caring for themselves. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976).  A claim based on inadequate medical care must show deliberate indifference by prison officials to a prisoner's serious medical needs. Estelle, 429 U.S. at 104; Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

Defendants concede, and the Court agrees, that Plaintiff has

serious medical needs.  (Def. Reply at 1.)  Consequently, the
sole question before the Court is whether a reasonable jury could
find that the Defendants were deliberately indifferent to those
needed and that question turns on the subjective intent of
Defendants.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  The
Supreme Court has held that "a prison official cannot be found
liable under the Eighth Amendment for denying an inmate humane
conditions of confinement unless the official knows of and
disregards an excessive risk to inmate health or safety."
<u>Farmer</u>, 511 U.S. at 837; <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120,
131 (3d Cir. 2001).  In the context of medical care, mere
allegations of malpractice or simple disagreements as to proper
medical treatment cannot establish a constitutional violation.
<u>Monmouth County Corr. Institutional Inmates v. Lanzaro</u>, 834 F.2d
326, 346 (3d Cir. 1987).  A claim of deliberate indifference is
found, <u>inter alia</u>, where

- "prison authorities deny reasonable requests
  for medical treatment . . . and such denial
  exposes the inmate to undue suffering or the
  threat of tangible residual injury";

- "necessary treatment is delayed for non-
  medical reasons";

- prison officials "opt for an easier and less
  efficacious treatment of the inmates
  condition"; or

- "prison authorities prevent an inmate from
  receiving recommended treatment for serious
  medical needs or deny access to physician
  capable of evaluating the need for such

15

treatment."

Id. at 346-47 (internal punctuation and citations omitted). Where there is evidence of inadequate medical care, the question of subjective intent becomes critical and is generally best left to the jury to decipher, with the help of live testimony and cross-examination.  Durmer v. O'Carroll, 991 F.2d 64, 68-69 (3d Cir. 1993); Young, 960 F.2d at 360 n.21 (noting that "[w]hen state of mind is an essential element of the nonmoving party's claim, resolution of the claim by summary judgment is often inappropriate because a party's state of mind is inherently a question of fact which turns on credibility").

      1.  Defendants CMS, Meeker, and Anicette

The Court finds that there is no evidence that Defendants Meeker and Anicette, and consequently CMS, were deliberately indifferent to Plaintiff's medical needs.  With regard to Plaintiff's request for particular doctors, Plaintiff has offered no evidence that only these particular doctors could provide Plaintiff adequate medical care, and Defendant Meeker testified to the contrary.  (Meeker Dep. at 26.) ("The care that can be provided to [Plaintiff] that is medically necessary was available within the established network [CMS has] in New Jersey.") This Court has previously noted that "a prisoner's subjective dissatisfaction with his medical care does not itself indicate deliberate indifference" and that principal remains true.

16

<u>Andrews v. Camden County</u>, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).

Therefore, neither Defendants Meeker[11] nor Anicette can be held

liable for this exercise of medical judgment, and Defendant CMS

cannot be held liable for any policy implications of this

decision.[12]   <u>See</u> <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658,

690-95 (1978) (finding there can be no municipal liability under

§ 1983 unless municipality is responsible for a policy or custom

that causes a constitutional violation); <u>Natale</u>, 318 F.3d at 583-

84.

Similarly, Defendant Anicette's response to the public

defender's informal request for assistance with Plaintiff's pain

management shows, if anything, diligence on Defendant Anicette's

part.  (Anicette Dep. at 125-28.)  He quickly followed up with

Defendant Ahsan, Plaintiff's treating physician, and learned that

Defendant Ahsan believed Plaintiff's medical care was under

---

[11] Furthermore, Defendant Meeker is not a physician and "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." <u>Spruil v. Gillis</u>, 372 F.3d 318, 236 (3d Cir. 2004).  Plaintiff has not submitted any evidence that suggests that Defendant Meeker was aware of such mistreatment.

[12] The Court further notes with regard to Defendant CMS, that in addition to there being no affirmative CMS policy or custom that violated Plaintiff's rights, there is no evidence that Defendant CMS turned a blind eye to any obviously inadequate practice.  <u>See</u> <u>Natale</u>, 318 F.3d at 584.  Plaintiff does not argue, nor could he, that Defendant CMS failed to act in the face of obviously deficient medical care, for Plaintiff's lengthy records of medical treatment defeat such a claim.

control.  (Id.)  The public defender did not follow-up with a

formal request.  (Id. at 131.)  The Eighth Amendment requires

only adequate medical care, not  extraordinarily diligent

treatment, and no jury could find based on the evidence presented

that Defendant Anicette failed to meet this baseline requirement.

See Lanzaro, 834 F.2d at 346.

        2.  Defendant Ahsan

    In contrast, Plaintiff has submitted sufficient evidence

from which a reasonable jury could conclude that Defendant Ahsan

was deliberately indifferent to Plaintiff's serious medical

needs.  See White v. Napoleon, 897 F.2d 103, 110-11 (3d Cir.

1990).  First, a jury could find that Defendant Ahsan was

deliberately indifferent because he did not provide Plaintiff

with a cystectomy or ileoconduit to correct chronic problems.

Defendant Ahsan himself noted that Dr. Parra concluded "the only

way to get rid of a fistula is to perform a cystectomy" and that

it might be necessary to perform an ileoconduit.  (Pl. Ex. 1 at

694.)  There are records indicating that Dr. Farajallah found

that "[s]urgical intervention is the ultimate solution" to

Plaintiff's medical problems.  (Id. at 844-49.)  Neither surgery

was performed and Plaintiff's medical records indicate that he

complained almost continuously of abdominal pain, including

fistula infection, until he was released.  (Pl. Ex. 6.)  The

refusal to provide medical treatment a specialist has deemed the

18

only effective cure would, if proven, constitute deliberate indifference.  White, 897 F.2d at 110-11 (citing Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1971)).  Plaintiff has presented evidence from which a fact-finder could conclude Defendant Ahsan refused to give Plaintiff necessary surgeries and that such refusal led to unnecessary and wanton infliction of pain in violation of the Eighth Amendment.  See id.

Defendant Ahsan argues that this is merely a matter of a difference of opinion between physicians and cannot constitute deliberate indifference.  In so arguing, Defendant Ahsan relies on Durmer, but the Court finds that Durmer only supports the conclusion that summary judgment is not appropriate here.  991 F.2d at 67-69.  In Durmer, as here, the defendant argued that because the plaintiff received some treatment, though not the recommended treatment, this precluded a finding of deliberate indifference because there was simply a difference of opinion between doctors.  Id. at 67-68.  The Third Circuit, however, found that though this might be one reasonable interpretation of the facts, it was not the only reasonable interpretation, for a fact-finder might conclude that the defendant's explanation for refusing the recommended treatment was merely a pretext for avoiding expensive physical therapy.  Id. at 68-69.  The appeals court went on to conclude that the issue of intent must be left to a jury at trial.  Id. at 69.  In the present case, Defendant

19

Ahsan claimed to not know why Plaintiff did not receive a cystectomy, yet Plaintiff's medical records indicate the Defendant Ahsan knew the surgery was necessary.  (Pl. Ex. 1 at 694.)  Dr. Ahsan himself concededly lacked the knowledge, training or experience to second-guess the specialists' recommendations for surgery.  From this a reasonable fact-finder could conclude that Defendant Ahsan had no medically justifiable reason for declining to provide Plaintiff with this "big operation" and was deliberately indifferent to the consequences of denying such treatment.  (Id.)  The question of Defendant Ahsan's intent is a material fact which must be decided by a jury at trial.  See Durmer, 991 F.2d at 69; Young, 960 F.2d at 360 n.21.

Similarly, a reasonable fact-finder could conclude that Defendant Ahsan was deliberately indifferent when he persisted in prescribing Plaintiff MS Contin, despite Plaintiff's regular complaints of constant pain.  See White, 897 F.2d at 109. Defendant Ahsan claims that he refused to return Plaintiff to pain medication that had previously been proven effective because he doubted Plaintiff's complaints of pain and noted his history of drug abuse.  (Ahsan Dep. at 156, 161.)  Plaintiff, however, has submitted evidence that Defendant Ahsan did not send Plaintiff to substance abuse treatment, nor did he consult a pain management expert.  (Id. at 162.)  From this, a reasonable fact-

finder might disbelieve Defendant Ahsan's purported reasons for denying Plaintiff effective pain medication and instead conclude that he was deliberately indifferent to Plaintiff's constant pain.  Again, the question of intent must be explored at trial. See Durmer, 991 F.2d at 69; Young, 960 F.2d at 360 n.21.

To the extent, however, that Defendant Ahsan seeks summary judgment as to Plaintiff's bowel obstruction, the Court will grant that motion.  The evidence in the record shows only that for twelve days Defendant Ahsan treated Plaintiff for constipation and saw no evidence of a bowel obstruction, until Defendant Ahsan reviewed an x-ray and saw evidence of a bowel obstruction, at which point he treated Plaintiff for that obstruction.  (Pl. Ex. 1 at 1210-31.)  Several days later, Defendant Ahsan reviewed another x-ray and sent Plaintiff to the hospital for treatment.  (Id. at 1244.)  No reasonable fact-finder could find, based on this evidence, that Defendant Ahsan was deliberately indifferent to Plaintiff's bowel obstruction. See Andrews, 95 F. Supp. 2d at 228 ("Courts will disavow any attempt to secondguess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment.") (quoting Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)).

**III. CONCLUSION**

For the reasons set forth above, the Court will grant summary judgment in full to Defendants CMS, Meeker, and Anicette. The Court will further grant partial summary judgment to Defendant Ahsan as to Plaintiff's medical malpractice claims and any Eighth Amendment claim arising out of the treatment of Plaintiff's bowel obstructions.  The Court will, however, deny summary judgment to Defendant Ahsan as to Plaintiff's Eighth Amendment claims arising out of the refusal to provide necessary surgeries or adequate pain medication.  The accompanying Order will be entered.


**December 23, 2008**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         United States District Judge

22